**2007 BNH 034**

---

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 03-11963-MWV
                                                          Chapter 7
Christine R. Mullen,
            Debtor

Christine R. Mullen,
            Plaintiff

v.                                                        Adv. No. 05-1113-MWV

Earl L. Kalil, Jr.,
            Defendant


*Steven M. Latici, Esq.*
*MCKEAN, MATTSON & LATICI, P.A.*
*and*
*Terrie Harman, Esq.*
*Attorneys for Plaintiff*

*Daniel W. Sklar, Esq.*
*NIXON PEABODY LLP*
*and*
*William C. Saturley, Esq.*
*NELSON, KINDER, MOSSEAU & SATURLEY, P.C.*
*Attorneys for Defendant*


## <u>MEMORANDUM OPINION</u>

This case involves a debtor/plaintiff who owned and operated an athletic club and who brought suit against the defendant, the plaintiff's former husband who also acted as the plaintiff's attorney and business financier post-divorce, and who guaranteed a loan for the plaintiff and subsequently became the assignee of the plaintiff's athletic club and long-term lease. The plaintiff alleges, *inter alia*, that the defendant wrongfully induced her into assigning the business and the leasehold and that there was a failure of consideration for these assignments. The plaintiff brings five counts related to the transactions between the parties: Count I for the defendant's breach of his fiduciary duties as prescribed by the New

Hampshire Rules of Professional Conduct; and four additional counts based on lack of consideration and/or the defendant's failure to pay debts that he undertook or otherwise perform his contractual obligations to the plaintiff.  For the reasons set forth below, judgment is for the defendant.   Also, before the Court is the defendant's proof of claim filed in the plaintiff's bankruptcy case, which claim is disallowed.

## JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## BACKGROUND

Christine R. Mullen ("Mullen") and Earl L. Kalil, Jr. ("Kalil"), were married in 1973, separated in 1993, and divorced in 1997.  Kalil is an attorney, and, throughout much of the marriage, Mullen worked in her husband's law firm where she typed, performed title searches, drafted deeds, and was the bookkeeper.  Pursuant to the parties' May 1997 Permanent Stipulation related to their divorce, Mullen was awarded the marital home located in New Castle, New Hampshire, and Kalil was the obligor on the mortgage held by Bank of New Hampshire.  (Pl.'s Ex. 1.)  In December 1998, the parties executed an Amended Stipulation pursuant to which Mullen would sell the New Castle home by June 1, 1999, and pay off the first and second mortgages.  (Pl.'s Ex. 2.)  Kalil was to continue making monthly mortgage payments through May 1999 or until the property was sold, whichever occurred first.  Id.

In the spring or summer of 1996, Mullen, along with a partner, decided to open an athletic club in Portsmouth.  She entered a twenty-year lease with the Mitchell A. Hyder, Edward A. Hyder Irrevocable Trust of 1993 (the "Hyder Trust"), razed an existing structure, and began construction of the athletic club

- 2 -

in or around December 1996. Mullen, with the help of attorney John Springer, formed two New Hampshire corporations, K & W Fitness, Inc., and Raynes Realty, Inc. K & W Fitness, of which Mullen owned 98% of the shares, was the operating company for the gym business, and Raynes Realty owned the long-term lease with the Hyder Trust. Raynes Realty was K & W Fitness's landlord.

During the marriage, the parties invested in an office complex known as Harbour Place, and Kalil's parents provided $217,000 to help with the initial investment. Mullen claims that she expected to receive $1.3 million from the sale of Harbour Place, however, pursuant to the parties' Permanent Stipulation, Mullen's share of the Harbour Place proceeds was to be reduced by $25,000 paid to Kalil and $217,709.16 repaid to Kalil's parents. (Pl.'s Ex. 1.) Thus, Mullen's final payout—$1,058,000—was approximately $242,000 less than she initially anticipated.

Mullen put this money, as well as an additional approximate amount of $400,000 in cash, toward construction of the athletic club. She also obtained a $300,000 loan from Bank of New Hampshire secured by Raynes Realty's leasehold and a third mortgage on her New Castle home as collateral. After completion of phase one of the construction, the athletic club opened for business in February 1997. Mullen's partner, who was to be the manager of the club, left soon after it opened. John Springer, the attorney who helped Mullen set up the corporations, assisted Mullen with legal issues related to the departing business partner. To finance phase two of the construction, Mullen sought an additional $575,000 loan from Bank of New Hampshire, but the Bank turned her down. Mullen was able to secure a $575,000 loan from First Alliance Bank, and the Hyder Trust also loaned $250,000 to help finish the project.

By late 1998, it became apparent that the debt was too much for the athletic club to service, so Mullen decided to sell the New Castle home to help finance the business. However, the sale proceeds would not be enough to pay off all three mortgages, and Bank of New Hampshire refused to release the third mortgage on the home that secured the $300,000 loan. Kalil became involved and negotiated an agreement by which Bank of New Hampshire released the third mortgage in return for Kalil's personal

- 3 -

guaranty of the $300,000 note.  Kalil also negotiated an early payoff of the First Alliance loan, whereby First Alliance accepted $475,000 in full satisfaction of the $575,000 debt.  Kalil, representing himself as Mullen's attorney, also negotiated a discounted payoff to The Bancorp Group, Inc. ("Bancorp"), an equipment lease company with which Mullen had a dispute.  Mullen sold the house in early 1999 for approximately $1.2 million, with which she paid $475,000 to First Alliance, the first and second mortgages on the house (totaling approximately $500,000), $94,000 to Bancorp, and $76,000 toward her credit card debt.  The early sale of the house excused Kalil of his obligation under the amended divorce stipulation to continue making mortgage payments through May 1999.  (Pl.'s Ex. 2.)  In all, Kalil avoided five months of mortgage payments, a total of $15,000.

In a letter dated July 3, 2000, Kalil informed Mullen that he would not renew his guaranty when the loan with Bank of New Hampshire came up for renewal on July 1, 2001, advising her to "plan accordingly."  (Pl.'s Ex. 4-A.)  Kalil's stated reason for his nonrenewal was that Mullen refused to allow him to review the athletic club's financial information.  Having also been apprised of Kalil's decision, the Bank of New Hampshire indicated in a July 6, 2000, internal memorandum that it might not renew the loan unless Mullen could find a suitable substitute guarantor.   (Pl.'s Ex. 36.)  Another internal Bank memorandum dated March 8, 2001, states that a Bank representative had "advised Ms. Mullen that due to the chronic loan delinquency and the historic lack of debt service coverage that it is unlikely that we would renew the note when it comes due in July."  (Def.'s Ex. 120.)  The Bank's concerns regarding Mullen's financial health are further documented in memoranda dated April 4, 2000, and February 1, 2001.  (Def.'s Exs. 148 and 119.)  Finally, on May 25, 2001, the Bank sent Mullen a letter simply stating that the loan would not be renewed upon its maturity on July 1, 2001.  (Pl.'s Ex. 10-B.)  Mullen replied on May 30, 2001, that she was "shocked" by the Bank's decision.  (Pl.'s Ex. 10-C.)

During this same period, the spring of 2001, Mullen decided to sell the leasehold, so she hired Kalil on a contingency fee basis to represent her in the sale.  Kalil was to receive a commission of five percent of the sales price if he found a buyer.  (Pl.'s Ex. 4-B.)  Kalil hired Peter Stanhope to appraise the

- 4 -

lease, and Kalil prepared and sent information to local developers.  In April 2001, Kalil received a

nonbinding offer from Steven Binnie, who expressed an interest in converting the athletic club to office

space and proposed a purchase price of $1 million.  (Pl.'s Ex. 7-A.)  Binnie's offer was contingent on

financing and securing a tenant for the office space.  At Mullen's direction, Kalil counteroffered with $1.6

million.  (Pl.'s Ex. 7-B.)  On April 20, 2001, Binnie informed Kalil that he was no longer interested.

(Def.'s Ex. 124.)

 In June 2001, with no more interested buyers and the July 1 loan renewal date approaching, the

parties reached an agreement whereby Kalil would pay Mullen's obligations on the lease, the Hyder Trust

note, and the Bank of New Hampshire note for three months in exchange for Mullen assigning the lease

to Kalil.  Kalil also paid real estate taxes and advanced Mullen $5,000 for payroll.  In addition to

executing the assignment of the lease (Pl.'s Ex. 14-A), the parties executed an Option and Rental

Agreement, which provided that beginning October 1, 2001—the end of the three month period—Mullen

would make monthly payments of $12,500 to Kalil, who was now her landlord.  (Pl.'s Ex. 15.)  The

Option and Rental Agreement also gave Mullen the option of repurchasing the lease if she paid Kalil the

amounts that he advanced under the agreement, plus ten percent interest.  Id.  Although the documents are

dated June 29, 2001, Mullen claims that they were actually signed in July, but backdated at Kalil's

request.  Kalil denies this.

 On September 6, 2001, Kalil sent Mullen a letter reminding her that she was expected to make

rent payments on time, stating, "If by 5:00 p.m. on October 1, 2001 and every month thereafter I am not

in receipt of $12,500.00 in good funds I will consider you have automatically terminated your tenancy

and will immediately take possession of the property."  (Pl.'s Ex. 4-C.)  In October and November 2001,

when Mullen began making monthly payments to Kalil pursuant to the Option and Rental Agreement,

Kalil's law firm represented Mullen on a surety bond issue with the office of the New Hampshire

Attorney General.  The law firm continued to bill Mullen for this work at least until May 2002 and

continued to bill Mullen until at least August 2002 for work related to Kalil's attempted sale of the lease. (Pl.'s Exs. 3-A to 3-G.)

Throughout its existence, the gym was unsuccessful and did not live up to Mullen's expectations. During the years 1997 through 1999, the gym generated income projections for the year ahead. Below are those projections along with the business's actual performance during those years.

| 1997 | Projected Income | 738,753 | |
| | Projected Expenses and Costs | 633,524 | |
| | Projected Net Profit | 105,229 | |
| | | | |
| 1997 | Actual Income | 687,951 | |
| | Actual Expenses | 800,628 | |
| | Actual Net Loss | (112,677) | |
| | | | |
| 1998 | Projected Income | 943,200 | |
| | Projected Expenses | 806,400 | |
| | Projected Net Profit | 136,800 | |
| | | | |
| 1998 | Actual Income | 859,107 | |
| | Actual Expenses | 873,751 | |
| | Actual Net Loss | (127,321) | |
| | | | |
| 1999 | Projected Income | 938,150 | 1,216,378[1] |
| | Projected Expenses | 917,650 | 917,650 |
| | Projected Net Profit | 20,500 | 298,728 |
| | | | |
| 1999 | Actual Income | 907,491 | |
| | Actual Expenses | 1,005,497 | |
| | Actual Net Loss | (98,006) | |

(Pl.'s Exs. 21, and 23-G at 4; Def.'s Exs. 104 at 3, 111 at 3, 113, 142 at 13-14, and 144.) In K & W Fitness's financial report dated December 31, 1999, its accountant expressed concern that the continuing losses "create an uncertainty about the Company's ability to continue as a going concern." (Pl.'s Ex. 23-G.) The poor health of the business is also reflected in the decline of Mullen's personal net worth. As of October 1996, the time when Mullen was about to start construction of the gym, her net worth was

---

[1] There are two different income projections for 1999. Although Kalil's counsel characterized them as Mullen's best case and worst case scenarios, the reason for the different projections was not established. The significant fact is that the gym's actual performance fell far short of both projections.

$2,413,000.  (Pl.'s Ex. 24-A.)  By January 2001, her net worth had fallen to $295,000, with her interest in the athletic club comprising $185,000 of the total.  (Pl.'s Ex. 24-E.)

Mullen attributes her business woes to a lack of capital directly related to her receiving $242,000 less than she expected from the Harbour Place sale.  She maintains that had she received that money, she would not have needed to borrow $300,000 from Bank of New Hampshire.  While she may not have needed to borrow from the Bank, Mullen has not shown why the $300,000 loan crushed the business or how $242,000 would have been adequate capital.  Her business plan called for start-up capital of $1,435,064 (Def.'s Ex. 142 at 10), which she more than provided, as she contributed $1,058,000 from the sale of Harbour Place, approximately $400,000 from her personal funds, a $575,000 loan from First Alliance Bank, a $300,000 loan from Bank of New Hampshire, and a $250,000 loan from the Hyder Trust.  These monies total $2,583,000, all which apparently were invested in the business within the first year or so of its existence.  Mullen has made no showing that the supposed undercapitalization of the business or its chronic losses are attributable to not having received an additional $242,000 from Harbour Place.

In November 2001, Mullen received an unsolicited letter of intent to purchase the athletic club. The nonbinding offer came from JFZ, LLC, an owner and operator of area athletic clubs.  Mullen met with JFZ representatives, who also visited the athletic club, and asked Kalil to represent her in the negotiations.  The proposed purchase price was $500,000, which was based on a monthly Electronic Fund Transfer (EFT)[2] of $35,000.  If the EFT turned out to be less than $35,000, the proposal provided for the difference to be multiplied by twelve and deducted from the $500,000 purchase price.  (Pl.'s Ex. 35.)  The $500,000 was to be paid as follows: $10,000 refundable deposit, $90,000 cash at closing, and $400,000

---

[2] The EFT represents the monthly membership fees automatically charged to regular members and does not include revenue generated from other types of memberships, such as three-month or six-month memberships.  According to the witnesses, the EFT is the primary asset of an athletic club and is fairly constant month to month.

over ten years.  Id.  Among the other provisions was one providing rates, based on square footage, at which JFZ would pay a monthly rent to Raynes Realty.  Id.

Kalil and JFZ's attorney, Gregory Uliasz, sent versions of the proposed purchase and sales agreement back and forth.  On or about December 17, 2001, Kalil faxed Uliasz a copy of the purchase and sales agreement that was marked up with handwritten crossouts, suggested additions, and questions. (Pl.'s Ex. 34.)  On or about December 20, 2001, Uliasz sent Kalil a version of the proposed agreement that incorporated several of the changes suggested by Mullen and Kalil, disregarded some of the suggestions, and contained additional terms generated by Uliasz and/or JFZ.  (Pl.'s Ex. 35.)  For example, Kalil and Mullen had crossed out the provision allowing JFZ to adjust the purchase price in the event the EFT was less than $35,000.  JFZ refused to take the provision out, but it did lower the EFT requirement to $30,000, without adjusting the purchase price.  Id.  Also, JFZ's original proposal suggested paying rent of $6.00 per square foot based on 21,000 total square feet.  JFZ accepted Mullen's change of $6.15 per square foot for an adjusted square footage of 23,415.  Id.  Mullen also suggested a two percent escalator clause that JFZ accepted with regard to the ground lease only.  Id.

The parties planned for a December 27, 2001, closing, which was postponed to December 31. The closing did not occur on December 31, as the parties had yet to agree on final terms and were still exchanging documents.  (Pl.'s Exs. 5-A and 5-E.)  On January 2, 2002, Uliasz sent Kalil a letter in which he states that he had not received from Kalil certain documents that he needed prior to closing and requested that Kalil confirm whether he still intended to close the transaction.  (Pl.'s Ex. 5-G.)  The parties scheduled a meeting for January 11, 2002.

Meanwhile, Mullen failed to pay her monthly rent to Kalil on January 1, 2002.  The parties disagree on whether Kalil terminated the lease for nonpayment or whether Mullen wanted to get out of the gym business and willingly turned the business over to Kalil.  Regardless of exactly how it happened, sometime between January 1 and January 11, 2002, Mullen and Kalil agreed that Mullen would turn the business over to Kalil.  When JFZ arrived at the scheduled meeting, Kalil told them that he now owned

- 8 -

the business and that JFZ now had to negotiate with him.  After discussing this development among themselves, the representatives of JFZ ended the negotiations and left the meeting.

Mullen claims that she executed documents on January 8, 2002, assigning the assets of K & W Fitness to Kalil, though the signed documents introduced at trial are dated January 29, 2002, which Kalil maintains is the correct date.  (Def.'s Exs. 134 through 139.)  Regardless of the exact dates of signing, it is evident that Mullen and Kalil had agreed, at least orally, to the assignment prior to the morning of January 9, 2002, when an attorney with Kalil's law firm sent a letter to the attorney general's office stating that the prospective buyer was The Fitness Zone, Inc., not JFZ.  (Pl.'s Ex. 38.)  The Fitness Zone was incorporated by Kalil on or about January 15, 2002.  Also, the agreement to assign must have happened before January 11, 2002, or else Kalil would not have represented himself to JFZ as the new owner of K & W Fitness.  The documents dated January 29, 2002, assign the following to Kalil:  the leases under which other business entities renting space in the property paid rent to K & W Fitness, K & W Fitness's bank accounts, the Harborside Athletic Club tradename, Mullen's rights under the Option and Rental Agreement, and all other assets of K & W Fitness.  (Pl.'s Exs. 14-B through E.)  In exchange, Kalil gave the following consideration, as memorialized in a Declaration of Consideration executed by the parties:

1.      Forgiveness and release of a certain debt in the amount of $78,383.58 owed by Seller to Earl L. Kalil, Jr.

2.      The assumption by Buyer (at Buyer's sole option) of certain other debts or obligations of Seller owed to third parties.

(Def.'s Ex. 134.)  An addendum to the declaration was a list of debts that comprised the $78,383.58, including outstanding legal bills generated by Kalil's law firm.

In January 2002, the athletic club lost a lot of members.  According to Mullen, they "left in droves" because Kalil took over.  According to Kalil, they left because they thought the gym was being sold to JFZ and because January is a time when many one-year, prepaid memberships expire.  After taking over the business, Kalil operated the athletic club and continued to lose money, and he sold the

equipment and remaining memberships in October 2002 for $100,000.  In November 2002, Kalil

refinanced and paid off the Hyder Trust note.  Kalil then spent more than $100,000 on renovation and

repair and sold the leasehold in March or April 2006 for $500,000.  (Pl.'s Ex. 32.)

<u>DISCUSSION</u>

I.    **Count I:  Breach of Fiduciary Duty**

The following discussion focuses on three periods of time identified by Mullen: (1) when Kalil

guaranteed Mullen's Bank of New Hampshire loan, (2) when Kalil obtained the leasehold from Mullen

after Mullen had hired him to market the leasehold, and (3) when Kalil obtained the gym business at or

about the same time as he was acting as Mullen's attorney in negotiations to sell the business to JFZ.

With respect to each of these time periods, Mullen argues that she and Kalil enjoyed an attorney-client

relationship, that he failed to disclose conflicts of interest, and that he caused her damages.

A.    Attorney-Client Relationship

In order for Kalil to have breached a fiduciary duty, he must have owed Mullen such a duty.  In

order for a fiduciary duty to have been owed in this case, there needs to have been an attorney-client

relationship between the parties.  Whether an attorney-client relationship exists is a question of law that

"is predicated on the circumstances of each case."  <u>McCabe v. Arcidy</u>, 635 A.2d 446, 449 (N.H. 1993).

The party alleging the existence of the relationship bears the burden of proving its existence.  <u>Id.</u>  "An

attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2)

the advice or assistance sought pertains to matters within the attorney's professional competence, and (3)

the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance."  <u>Id.</u>

(quotations omitted).  "Neither contractual formality nor compensation nor expectation of compensation

is required."  <u>Streit v. Covington & Crowe</u>, 82 Cal. App. 4th 441, 444 (Cal. Ct. App. 2000) (quotations

omitted).

- 10 -

The Court agrees with Kalil's expert witness that the parties' complex history is relevant as to whether an attorney-client relationship existed at any particular time and, if so, as to the nature of the relationship.  At various times, the parties have been husband and wife, employer and employee, attorney and client, landlord and tenant, and plaintiff and defendant.  Throughout the years relevant to this case, Kalil at times billed Mullen for legal work and represented to third parties that he was her attorney.  At times, Kalil became involved with Mullen's business and finances while also providing legal assistance and advice.  Mullen identifies three periods of time in which she alleges that she and Kalil shared an attorney-client relationship.

    1.  The Bank of New Hampshire Guaranty

The first time period is 1998–1999 when Mullen was selling her New Castle home and Kalil guaranteed the Bank of New Hampshire note.  Kalil evaluated Mullen's finances, and he negotiated on Mullen's behalf with First Alliance, Bancorp, and Bank of New Hampshire.  For example, in a February 1999 correspondence with Bancorp, Kalil represented himself as Mullen's attorney.  (Pl.'s Ex. 6-A.)  The totality of the circumstances establishes that an attorney-client relationship existed when Kalil guaranteed the Bank of New Hampshire note.  Indeed, Kalil conceded at trial that such a relationship existed.

    2.  The Assignment of the Leasehold

Mullen next argues that an attorney-client relationship existed between March and July of 2001, beginning in March when Kalil attempted to sell the lease for Mullen, and continuing through June/July when Mullen assigned the lease to Kalil.  In March, the parties entered into a contingent fee agreement whereby Kalil's fee would be five percent of the sales price if he found a buyer.  (Pl.'s Ex. 4-B.)  Kalil prepared binders that he sent to local developers, and he also hired an appraiser, Peter Stanhope.  In April 2001, a developer, Steven Binnie, replied to Kalil with a nonbinding letter of intent, and Kalil handled all negotiations between Mullen and Binnie.  By April 20, Binnie was no longer interested, and Kalil received no further offers for the lease.

- 11 -

Rather than dispute the existence of an attorney-client relationship, Kalil argues that the relationship terminated sometime after the Binnie offer fell through in April and before he and Mullen began the discussions in June that resulted in Kalil being assigned the lease.  The determination of whether an attorney-client relationship has terminated is, like the issue of whether the relationship existed in the first instance, a matter of law based on the circumstances of each case.  Coyle v. Battles, 782 A.2d 902, 906 (N.H. 2001).

Kalil argues that the attorney-client relationship terminated after the Binnie offer and before the assignment because (1) he stopped actively marketing the lease, (2) no more offers were received, and (3) by June it was too late for an offer to arrive and alleviate Mullen's mounting financial pressure (although the Bank indicated in March 2001 that it was unlikely to renew the note, it was not until May 25, 2001, that the Bank definitively informed Mullen of its decision, leaving her just over a month until the loan matured on July 1 to pay it off or make other arrangements).

 Mullen testified that she thought that Kalil was still representing her with regard to the lease after the Binnie offer fell through.  Kalil testified that, after the Binnie offer, he and Mullen were in frequent contact, and Kalil's efforts to further market the lease never came up in conversation.  Kalil further testified that he suggested to Mullen that she list the lease with a broker.  Kalil's testimony that he thought the relationship lapsed, and Mullen's testimony that Kalil was still representing her with regard to the sale of the lease establishes the nonexistence of "a distinct and unequivocal understanding between attorney and client that the relationship has ceased."  2 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 14.3 (2006 ed.).

During this time, Mullen was receiving bills from Kalil's law firm for what appears to be a variety of legal work, and Mullen received bills in 2002 that appear to include charges related to the marketing of the lease in the time period in question.  A Declaration of Consideration executed by the parties in 2002 references five legal bills sent to Mullen by Kalil's law firm dated February 15, 2001, March 17, 2001, April 13, 2001, May 11, 2001, and June 18, 2001.  (Def.'s Ex. 134.)  With the exception

- 12 -

of the June 18 bill, which was for title work, Kalil could not identify what the other bills were for, though approximately $1,200 might have been related to the Stanhope appraisal of the lease. Additionally, bills issued in May, July, and August 2002 for an unpaid balance of $4,137.72 are for "sale of lease holdings," which appears to refer to the marketing of the leasehold. (Pl.'s Exs. 3-E through 3-G.)

The Court is convinced, too, that had another expression of interest arrived from another developer in May or June, Kalil would have handled the negotiations and expected to collect his five percent fee. The totality of the circumstances—including the fee agreement, the lack of a disengagement agreement, the legal bills, and the short period of time involved—suggests that the parties continued to enjoy an attorney-client relationship in June and July 2001 when they entered into the assignment of the lease and the Option and Rental Agreement.

3.    <u>The JFZ Negotiations</u>

Finally, it is Mullen's position that an attorney-client relationship existed in December 2001 and January 2002 when Kalil represented her in the JFZ negotiations. Kalil does not appear to dispute the existence of the relationship, as Kalil was handling all of the negotiations with JFZ's attorney, Greg Uliasz. The Court agrees that an attorney-client relationship existed at that time.

B.    <u>Rules of Professional Conduct</u>

Mullen argues that Kalil breached his duty of loyalty on each of the three occasions discussed above because, on each occasion, conflicts of interest arose and Kalil failed to disclose the conflicts, which might have been remedied by Mullen's informed consent or by Kalil advising her to seek independent legal counsel.

An attorney owes a client the duty of undivided loyalty. When an attorney's own interest comes into conflict with the interest of the client, the attorney's loyalty to the client is no longer undivided. <u>See In re Estate of McCool</u>, 553 A.2d 761, 769 (N.H. 1988). At a minimum, a conflict must be disclosed to the client, and, generally, the client must give informed consent in order for the representation to continue. Failure to disclose a conflict can be a breach of an attorney's duty of loyalty. The New

- 13 -

Hampshire Rules of Professional Conduct are prefaced by the statement, "The Rules of Professional Conduct are rules of reason. . . .  Violation of a Rule should not itself give rise to a cause of action nor should it create any presumption that an independent legal duty has been breached.  The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies.  They are not designed to be a basis for civil liability."  N.H. R. Prof. Conduct Scope.  The Rules do, though, provide an "instructive backdrop" by which to evaluate whether Kalil breached his fiduciary duty of loyalty.  Kalled v. Albee, 712 A.2d 616, 617 (N.H. 1998).  Rule 1.7(b) provides, in relevant part:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited . . . by the lawyer's own interest, unless:
>
> > (1) the lawyer reasonably believes the representation will not be adversely affected; and
> >
> > (2) the client consents after consultation and with knowledge of the consequences. . . .

N.H. R. Prof. Conduct 1.7(b).  The standard for Rule 1.7(b)(1) is whether, at the time Kalil undertook the representation, a reasonable attorney would have appreciated that Kalil's representation of Mullen may be materially limited by Kalil's own financial interests.  See Case of Drucker, 577 A.2d 1198, 1202 (N.H. 1990).  "Perhaps the clearest case of a conflict is where the lawyer has a significant adverse financial interest in the object of the representation.  Such a financial interest, other than one so insignificant that a person of normal sensibility would be unaffected by it, ordinarily constitutes a conflict of interest.  A lawyer having such an interest is prohibited from accepting or continuing the representation unless the affected client gives informed consent."  Restatement (Third) of the Law Governing Lawyers § 125 cmt. c (2000).

In addition to Rule 1.7(b), Rule 1.8(a) applies to transactions between attorneys and clients:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms in which the lawyer acquires the interest are: (i) fair and reasonable to the client; and (ii) agreed to by the client after consultation;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing to the essential terms of the transaction.

N.H. R. Prof. Conduct 1.8(a).

It is clear that a conflict of interest arose on each of the three occasions in question.  First, when Kalil guaranteed the Bank of New Hampshire note, his financial interests became adverse to Mullen's.  Indeed, Kalil has filed a bankruptcy claim based upon his subrogation rights.  Second, when Mullen assigned the leasehold to Kalil, Kalil became Mullen's landlord and became significantly entangled with Mullen's third-party obligations, some of which Kalil assumed.  Third, at the time he undertook to represent Mullen in the JFZ negotiations, it was clear that the outcome of the negotiations would have financial implications for Kalil.  Kalil was in the position to scuttle a deal that he felt was not in his best interests or to champion a deal that served his interests over Mullen's.  Additionally, Kalil had the right to terminate the lease in the event Mullen failed to pay rent, which is essentially what ended up happening. The Court is certain that a reasonable lawyer would have perceived a conflict of interest at the time Kalil undertook the representation.

C.    Damages

Having found that a conflict existed on all three occasions, the question remains whether the conflicts are sufficient to support this civil suit for damages.  As noted above, the New Hampshire Rules of Professional Conduct "are not designed to be a basis for civil liability."  N.H. R. Prof. Conduct Scope. Also as noted above, the Court agrees with Kalil's expert witness that the relationship between the parties has to be considered, not only in the determination of whether the attorney-client relationship existed, but also in the determination of civil liability.  The parties were married for over twenty years.  They were involved in business dealings together during the marriage.  Mullen was employed in Kalil's law firm.

Mullen relied on Kalil for legal advice up to the time of their separation and divorce and thereafter. Mullen had, prior to the occurrences in question here, separate legal representation at times.

Because of this relationship and the parties' testimony at trial, the Court finds that Mullen had knowledge of the conflict in each instance and consented to Kalil's representation by participating in the transaction. Mullen had another attorney, John Springer, who advised her from time to time, but it appears she went to Kalil when she needed legal advice plus financial advice/assistance. The Court cannot find that, in each instance, in order to waive the conflict, there had to be evidence of instruction by Kalil to Mullen that a conflict existed and the necessity to seek separate counsel. Because of their relationship, which largely revolved around Kalil's law firm, the Court is convinced that Mullen was aware of the conflicts, elected to go forward, and cannot now use them as a basis for civil liability.

Each of the transactions in question arose out of the consequences of Mullen's construction, financing, and operation of the health club, which invariably underperformed.[3] In each instance, Mullen sought out the assistance of Kalil. There is insufficient evidence that any of Kalil's actions were intended to harm Mullen or actually caused the harm that she now alleges. Further, there is insufficient evidence that Kalil's actions were intended for his own benefit or actually were beneficial to him.

As to the transactions in question, the Court finds:

1.    The Bank of New Hampshire Guaranty

Mullen alleges that Kalil's guaranty of the Bank of New Hampshire loan and subsequent refusal to renew the guaranty caused the Bank to not renew the loan. In a letter dated July 3, 2000, Kalil informed Mullen that he would not renew his guaranty in July 2001 when the loan matured. (Pl.'s Ex. 4-A.) An internal Bank memorandum dated July 6, 2000, shows that Kalil's letter was also sent to the Bank. (Pl.'s Ex. 36). The Bank memorandum states, "Based on [Kalil's refusal to renew the loan], I

---

[3] For example, as discussed above, the business continually had net losses and fell short of its performance projections, and, in 1999, its accountant reported his concern with whether the business could continue as a going concern. Additionally, the Court found above that the gym's underperformance caused Bank of New Hampshire to call its note.

suggest we make sure [Mullen] understands that the loan will not be renewed at maturity unless a satisfactory replacement for [Kalil] is obtained." Id. Mullen argues that this memorandum proves that the reason for the Bank's ultimate refusal to renew the loan was because of Kalil's refusal to renew his guaranty. However, there is evidence that the Bank had serious concerns about Mullen's ability to pay the loan.

Despite the Bank's internal suggestion in July 2000 that it inform Mullen of the likelihood of nonrenewal, the Bank did not actually alert her to this possibility until March 8, 2001, as another internal Bank memorandum describes a meeting between a Bank representative and Mullen: "I advised Ms. Mullen that due to the chronic loan deficiency and the historic lack of debt service coverage that it is unlikely that we would renew the note when it comes due in July." (Def.'s Ex. 120.) At trial, Mullen corroborated that at that meeting the Bank representative told her the reason for the probable nonrenewal was the frequency of late payments.

A series of Bank correspondence in 2000 and 2001 also indicate that the gym's under-performance substantially caused the Bank to not renew the loan. An April 4, 2000, memorandum documents that the loan had been renewed for another year but also expresses concern about the future, stating that Mullen no longer had "the ability to inject cash into the company as was done last year" and that the cash flow was unable to satisfy the debt obligations. (Def's Ex. 148 at 10.) At that time, the Bank gave Mullen an unfavorable credit rating of seven (on a ten scale, with ten being most unfavorable). Id. at 1. Ten months later, a Bank memorandum dated February 1, 2001, shows that the Bank continued to give Mullen a risk rating of seven, based on Mullen's inability to service the debt and the past due status of the loan. (Def's Ex. 119.) The memorandum states, "Based on operating results of 12/00, if D/S reports a continued inability and loan continues to be past due, consider sending the credit to workout given Mr. Kalil has indicated that he will not be guaranteeing the loan with that renewal." Id. Another Bank document reveals that Mullen had been past due at least sixty days for at least the prior twelve months. (Def.'s Ex. 149.)

- 17 -

Finally, on May 25, 2001, the Bank sent Mullen a letter stating, "As I have been unable to reach you by phone recently, I am sending you this letter regarding the upcoming loan maturity.  The Bank will not renew the loan when it matures on July 1, 2001."  (Pl.'s Ex. 10-B.)  Mullen hand-delivered a response to the Bank on May 30, 2001, indicating that she was "shocked" by the Bank's decision.  (Pl.'s Ex. 10-C.)  In that letter, Mullen opines that the Bank's decision was due to late payments or the need to find a substitute guarantor.  Id.  Apparently not having received Mullen's letter of the previous day, the loan officer's May 31, 2001, internal memorandum states as follows:

> Today I set-off the K and W Fitness checking account for Ms. Mullen's loan payment due for 4/23 in the amount of $4252.54.  I have called Ms. Mullen numerous times in the past month to discuss overdrafts and loan status but she has not returned my calls.  She has also not responded to the registered mail that I sent advising her that we would not renew the subject loan . . . .  Should the loan not be paid off at maturity it is likely that we will send it [to] workout given the poor financial condition of the gym, payment defaults and lack of cooperation from the borrower.

(Def.'s Ex. 127.)  Although Mullen argues that it was actually the Bank that was avoiding contact with her, the truth of who was trying to contact whom is not material.

Based on the evidence, the Court is unconvinced that the sole—or even main—reason the Bank refused to renew the loan was because Kalil refused to renew his guaranty.  Rather, the Court finds that the Bank's decision was based on the gym's unprofitability, the continuous payment defaults, and Kalil's refusal to renew.  The sum of these factors is a risky investment, of which the Bank was well aware, as documented in its memoranda.

### 2.    The Assignment of the Leasehold

Mullen alleges that Kalil's actions somehow thwarted her ability to sell the leasehold interest.  Once again, the facts do not support this allegation.  It is uncontested that Mullen employed Kalil to market the leasehold interest.  The unrefuted testimony is that he did, in fact, market the leasehold to area real estate developers, and there was only one expression of interest.  This expression of interest was withdrawn when Kalil, per Mullen's instruction, counteroffered at $1.6 million.  The Court can only find that it was the counteroffer, not Kalil, that caused the would-be purchaser to withdraw.

- 18 -

Mullen also alleges that the June 28, 2001, Option and Rental Agreement by which Kalil acquired the leasehold subject to Mullen's option was not supported by adequate consideration and, therefore, a breach of his duty to her.[4] At trial, considerable time was given to the appraisers' testimony. Both appraisers inspected the building in November 2002. Mullen's appraiser made the effective date of his appraisal July 1, 2001, the date of the Option and Rental Agreement. That appraisal found the highest and best use to be office space and appraised the building at $1.3 million as if it were a fully occupied office building as of that date. The Court agrees with Kalil's expert that the $1.3 million appraisal is unduly optimistic. For instance, it does not take into account the time and money involved in renovating the building, assuming that the athletic club became an office building at the snap of a finger. Additionally, the $1.3 million appraisal assumes that all future rents will be maximized and seems to ignore the long-term leases already in place, which would limit the leasehold owner's ability to collect market rates.

On the other hand, Kalil's appraiser, Madden, appraised the property as of February 2002, approximately the time that the Option and Rental Agreement was terminated and Kalil became the holder of the leasehold, no longer subject to Mullen's option. The Court agrees that this date is the proper date for the valuation of the leasehold. Madden found the highest and best use to be mixed use and used the existing rents for the basis of his appraisal. His appraisal established the value to be $620,000. This amount approximates to Kalil's claim in this case of $646,091.34. Further support for this valuation is the fact that Kalil sold the leasehold in 2006 for the sum of $500,000 after doing significant repair and restoration. The Court, for purposes of this opinion, therefore finds the value of the leasehold as of February 2002 to be $620,000 and further finds that Kalil gave fair consideration for the transfer.

Having determined the value of the leasehold, the Court must consider the circumstances surrounding the assignment. Kalil testified that Mullen came to him and expressed her belief that if she

---

[4] The Court has, in a separate adversary proceeding, dismissed all fraudulent conveyance counts, which dismissal has become a final order.

could get a few-month breather from her obligations she would be able to get the business back on track.

Kalil further testified that his aim was not to own the leasehold, but to receive some collateral in exchange

for paying Mullen's bills and assuming the Bank of New Hampshire note.  The presence of the option in

this particular case indicates an understanding between the parties that Mullen anticipated exercising the

option when she became able.  The option period expired on October 1, 2002, but could be extended for

one year by the agreement of the parties, thus potentially providing Mullen more time to reacquire the

leasehold.  Mullen could exercise her option to regain the leasehold by paying the Bank of New

Hampshire note, the Kalil legal bills, and any payments made on Mullen's obligations to the Hyder Trust

and the Bank of New Hampshire, plus ten percent interest.  Prior to entering into the assignment and the

Option and Rental Agreement, Mullen consulted her accountant and a business acquaintance.

Mullen characterizes the situation as Kalil benefitting at Mullen's expense, citing Goldman v.

Kane, as being factually similar to the instant case.  329 N.E. 2d 770 (Mass. App. 1975).  In Goldman, the

client signed a purchase and sales agreement for the purchase of a sailboat, but then he became unable to

secure a bank loan and was in danger of losing his deposit.  The attorney offered to loan the client

$30,000 to complete the boat transaction, but demanded, as consideration, absolute title to the following:

a parcel of real estate, all of the personal property located at the property, and another boat owned by the

client.  The attorney also demanded that the client execute a $30,000 note secured by the title to the new

sailboat, which title was to be conveyed to the attorney and reconveyed upon satisfaction of the note.

Stating that "[t]he law looks with great disfavor upon an attorney who has business dealings with his

client which result in gains to the attorney at the expense of the client[,]" the court held that the attorney

breached his fiduciary duty because of "[t]he fundamental unfairness of the transaction and the egregious

overreaching"of the attorney.  Id. at 773.

Goldman is distinguishable, though, in that the relationship between the Goldman attorney and

client was not personal or complex such as between Mullen and Kalil.  Moreover, the sum of the evidence

in this case is that Kalil did not benefit at Mullen's expense.  In June 2001, Mullen was in a difficult

position.  With the Bank of New Hampshire note coming due on July 1, no substitute guarantor, no

buyers for the leasehold, and an underperforming business, assigning the leasehold to Kalil with an option

to repurchase was apparently one of the only choices Mullen had.  Kalil did not put Mullen in this

position, though, as he had not been involved with the business before this time, and the athletic club's

poor financial performance gave Bank of New Hampshire ample reason to call the note.  Kalil stepped in

to help Mullen, providing her an opportunity to focus on the business without having to pay the bills.

Under the Option and Rental Agreement, Kalil made payments on the Hyder note, paid rent to the

Hyder Trust on the underlying lease, and made utility and property tax payments.  Kalil also gave Mullen

$5,000 for payroll.  In all, as shown in the Declaration of Consideration, Kalil paid approximately

$78,384 to Mullen, on behalf of Mullen, or on the Bank of New Hampshire note.  Also, Mullen was not

required to pay rent for the first three months following the agreement, a savings of $37,500 (based on

rent of $12,500 per month).   Kalil also assumed the Bank of New Hampshire note that had an

outstanding balance of $215,757.25.  (Def.'s Ex. 130.)  That document also provided that the Bank could

release Mullen from the note.  Id.

Counting the assumption of the note, the forgone rent, and the payments on behalf of Mullen,

Kalil paid at least $303,200 for the assignment of the lease.[5]  At the time of the assignment, Kalil's

absolute ownership of the leasehold was contingent upon Mullen's failure to exercise her option, so Kalil

---

[5]  This figure includes (1) $49,943 of the $78,384 outlined in a Declaration of Consideration, and includes payments to the Hyder Trust, utility and property tax payments, Mullen's payroll advance, and outstanding legal bills, but does not include payments Kalil made toward the Bank of New Hampshire note during the option period because those amounts are included in the outstanding principal balance of the note when Kalil assumed it; (2) $215,757.25, the outstanding balance of the Bank of New Hampshire; and (3) $37,500, representing rent that would have been due from the gym during the first three months of the option period.  The Declaration of Consideration was not signed at the time of the Option and Rental Agreement, but in January 2002 when Mullen assigned the business to Kalil and formally assigned the leasehold, surrendering her rights under the Option and Rental Agreement.  Although these amounts are listed as consideration for all of the assignments (Mullen's rights under the Option and Rental Agreement, trade name, subleases, etc.) made in January 2002, the Court considers them to be valid consideration for the initial assignment of the leasehold because most of these payments were made during the option period and were the types of payments contemplated in the Option and Rental Agreement that Kalil would pay in lieu of Mullen.

did not receive full ownership of the leasehold in June 2001, and the parties most likely expected Mullen to exercise her option.  Also, the option period was extendable beyond October 2002.  The Court finds neither the option terms nor the consideration paid to be unfair to Mullen.  Kalil paid fair consideration for the leasehold considering that the Kalil's ownership of the leasehold was subject to Mullen's option, and because Kalil sold the leasehold for $500,000 in 2006 after making considerable improvements to the building.  Mullen was in a bind, but the sum of the evidence is not that Kalil took advantage of her.

Following the collapse of the JFZ negotiations in January 2002 discussed below, Mullen assigned the following to Kalil's new corporation, The Fitness Zone: the leases between K & W Fitness and third-party lessees, K & W Fitness's bank accounts, the "Harborside Athletic Club" trade name, and Mullen's rights and interest under the Option and Rental Contract.  (Pl.'s Exs. 14-A through 14-E.)[6]  Mullen alleges that these assignments, like the June 2001 assignment of the leasehold, was not supported by adequate consideration.  While it is true that the Declaration of Consideration discussed above was executed in conjunction with the January 2002 assignments, the Court found above that much of that consideration could be considered valid consideration for the Option and Rental Agreement.

When Kalil took over the business, he took over the obligations on the Hyder Note.  In 2002, Kalil sold the business assets for $100,000 and, in 2006, he sold the leasehold for $500,000.  There is nothing to suggest that Kalil sold these assets for less than fair market value.  As noted above, given Mullen's characterization of Kalil's motivations, one should expect that he sold the assets for as much as he could. The business had been deteriorating, as shown in the financial reports for 1997 through 1999.  Apparently, the business stopped preparing financial reports in 2000 and 2001, suggesting further deterioration.  Also, membership dropped off in January 2002 for reasons disputed by the parties.  The totality of the evidence indicates that Kalil sold the business assets for approximately market value.

_____

[6]  Mullen testified that she executed the assignments on January 8 rather than January 29, the date of the assignment documents admitted at trial.  However, she has not pointed to any tangible difference between the admitted exhibits and other documents she purportedly signed.  More importantly, she does not dispute that she assigned the assets listed above.

As consideration for the January 2002 assignments of the business, Kalil assumed Mullen's obligation on the Hyder Note, which he paid off in 2002. According to Kail's proof of claim, the payoff amount was $174,554. (Def.'s Ex. 141.) While Kalil's proof of claim has not yet been allowed, the amount of the Hyder note payoff was not disputed and appears to be in the neighborhood of the correct amount. Thus, Kalil paid consideration of approximately $174,554 for assets worth approximately $100,000. The remaining $74,554 is additional consideration for the entire group of assignments, which include Mullen's rights under the Option and Rental Agreement, thereby giving Kalil absolute ownership of the leasehold.

Kalil also testified that he paid off various trade creditors, but it is unclear as to what and whom he paid. On the other hand, Mullen argues that Kalil failed to pay some obligations with which she became saddled. However, adoption of either position would not materially affect the Court's conclusion that Kalil paid adequate consideration for the business.

3. <u>Negotiations with JFZ</u>

In November 2001, Mullen received a letter of intent to purchase the health club from JFZ, LLC. The provisions of the letter of intent are described above. A purchase and sale agreement was drafted but never signed. The parties originally planned to close on December 27, 2001, then it was rescheduled for December 31, at which date the closing did not take place. A meeting was held on January 11, 2002, at which meeting Kalil stated that he was now the owner of the health club. The proposed purchasers caucused and left the meeting. The deal never closed. Mullen argues at trial that the deal would have closed absent Kalil's interference. The Court finds that the facts do not support Mullen's conclusion. At the time of the January 11 meeting, several material provisions of the sale had not been agreed to, namely, the minimum value requirement of the EFTs, who would pay the broker, and the issue of the personal guarantees and collateral from the buyers. There was also the issue of the athletic club's outstanding debts to creditors. For instance, JFZ required Mullen to obtain a pay-off letter and release from the lessor on the equipment lease. The haste with which the JFZ representatives scuttled the negotiations at the

January 11 meeting suggests, too, that their interest in buying the business was not as firm as Mullen and Kalil hoped.  The sum of the evidence does not suggest that but for Kalil's involvement the sale would have been consummated.

## II.        Count II:  New Hampshire Consumer Protection Statute

Count II of Mullen's complaint alleges that Kalil violated NH RSA 358-A:2, New Hampshire's consumer protection statute that prohibits "any unfair or deceptive act or practice in the conduct of any trade or commerce."  Although Mullen alleged in her complaint that certain of Kalil's acts violated the statute, she has not addressed Counts II through V either at trial or in her post-trial memorandum.  Mullen asserts that the following alleged actions of Kalil were unfair and deceptive in violation of the statute: (1) after the leasehold assignment, Kalil intentionally failed to inform Mullen that his continued representation posed a conflict of interest in order to prevent her from seeking independent legal advice; (2) to avoid the "imminent" sale to JFZ, Kalil induced Mullen into turning over the business to him by misinforming her of his rights under the lease; (3) Kalil knowingly and intentionally failed to pay creditors that were secured by Mullen's guaranty, knowing that the creditors would sue Mullen; and (4) Kalil subleased leased equipment but did not pay the original lessor, knowing that the lessor would sue Mullen.  (Ct. Doc. No. 1.)

The statute lists fourteen prohibited acts and practices but states that the list is not exhaustive.  Mullen has not stated that any of Kalil's alleged actions fall into any particular enumerated prohibited act, and the Court's survey of the list indicates that none of the expressly prohibited examples apply.  The applicability of the statute is unclear with regard to the quasi-private transactions between Mullen and Kalil.  "To determine whether the Consumer Protection Act applies to a particular transaction, we analyze the activity involved, the nature of the transaction, and the parties to determine whether a transaction is a personal or business transaction."  Hughes v. DiSalvo, 729 A.2d 422, 424 (N.H. 1999).  However,

assuming, *arguendo*, that the statute is applicable, Mullen has not proven any of her allegations under NH RSA 358-A:2 by a preponderance of the evidence.

First, the evidence does not prove that Kalil failed to inform Mullen of the conflict of interests in order to prevent her from seeking independent legal advice. Rather, the evidence indicates that Kalil became involved with Mullen in an attempt to help her, and his failure to formally consider the conflicts is due more to the complex relationship of the parties than to an intention to keep her from seeking independent counsel.

With regard to Kalil allegedly misinforming Mullen of her rights in order to thwart the "imminent" sale to JFZ, the evidence failed to establish that (1) the sale was imminent or (2) that Kalil induced Mullen by misinforming her of her rights as opposed to Mullen seeking a way out of the business.

As for Kalil knowingly and intentionally failing to pay creditors secured by Mullen's guaranty, Mullen has presented no evidence to prove this. It appears that Mullen is referring to creditor Citizens Bank, which filed a proof of claim based on Mullen's guaranty. However, Kalil testified to paying a Citizens Bank debt, and there is insufficient evidence to prove that the Citizens Bank debt is the debt referred to in Mullen's complaint. Also, there is no proof of Kalil's alleged intent. Similarly, Mullen failed to prove her allegation that Kalil intentionally failed to pay an equipment lease knowing that the lessor would sue Mullen. Little, if any, evidence was presented to rebut Kalil's testimony that he paid off the equipment leases. Based on all of the above, Kalil's actions do not meet the rascality test, under which "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." Becksted v. Nadeau, 926 A.2d 819, 822 (N.H. 2007) (quoting State v. Moran, 861 A.2d 763, 765 (N.H. 2004)).

### III.  **Count III:  Misrepresentation**

Mullen alleges that Kalil induced her into conveying the leasehold to him by promising to pay off the Bank of New Hampshire note, which he failed to do, and to remove Mullen as guarantor.  Mullen alleges that Kalil's purpose was to procure the leasehold at a price that was substantially below market. As discussed above, the Court does not find the consideration paid by Kalil to have been inadequate, and the Court does not find that Kalil profited at Mullen's expense.  Kalil did pay off the Bank of New Hampshire note in 2002, thus terminating any surety obligation of Mullen.  As for Mullen's contention that Kalil's alleged misrepresentation forced her into bankruptcy, this has not been proven.

### IV.  **Count IV:  Assumpsit**

Mullen's claim in assumpsit also fails, as the Court has rejected her argument that she conveyed the leasehold and the business for no consideration, and a preponderance of the evidence has not been established proving that Kalil failed to pay obligations undertaken by him, thus causing certain creditors to continue to pursue Mullen.

### V.  **Count V:  Rescission**

As the Court has rejected Mullen's argument that there was a failure of consideration for the leasehold and the business, Mullen's claim for rescission of the contracts is denied.

### VI.  **Kalil's Bankruptcy Claim**

Kalil filed a bankruptcy claim in the amount of $646,091.34, which he filed apparently in response to Mullen's complaint alleging that the conveyances to Kalil were fraudulent conveyances.  The Court dismissed Mullen's fraudulent transfer claims on summary judgment.  Kalil's claim includes a secured portion of $545,000 that he sought to setoff in the event that Mullen prevailed on her fraudulent conveyance action.  Included in Kalil's total claim are monies that he spent renovating the building and payments he made on behalf of Mullen.  The amounts listed in Kalil's proof of claim are monies that he

either paid as consideration for the leasehold and business or that he spent on renovations that are relevant to the value of the leasehold but not appropriate for Kalil to recoup from Mullen.  For these reasons, including the disposition of the fraudulent conveyance action, Kalil's bankruptcy claim is disallowed in full.

### CONCLUSION

This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate final judgment consistent with this opinion.

DATED this 14th day of September, 2007, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge